# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2009

Charles R. Fulbruge III
Clerk

No. 08-10903

PAUL T. PALMER, by and Through His Parents and Legal Guardians,
Paul D. Palmer and Dr. Susan Gonzalez Barker,

Plaintiff-Appellant,

versus

WAXAHACHIE INDEPENDENT SCHOOL DISTRICT,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Paul Palmer, a student at Waxahachie High School, submitted three shirts for approval under the dress code of Waxahachie Independent School District ("the District"), whose administration told Palmer the shirts violated the code and could not be worn to school. Palmer sued and requested a preliminary injunction, which the district court denied. He appeals, and we affirm.

I.

On September 21, 2007, Palmer, then a sophomore, went to school wearing a shirt with "San Diego" written on it. Assistant Principal Johnson told Palmer his shirt violated the District's dress code,[1] which did not allow t-shirts with printed messages. Palmer called his parents, who brought him a "John Edwards for President '08" t-shirt to wear instead. Johnson said Palmer would not be allowed to wear that shirt either, because it contained a printed message. Palmer appealed the decision to Principal David Nix, who denied the appeal, and that denial was sustained by the District's Superintendent, Thomas Collins.

On April 1, 2008, Palmer sued the District under 42 U.S.C. § 1983, alleging that the dress code violated his freedom of speech under the First Amendment. He asked for declaratory relief under 28 U.S.C. § 2201, a preliminary injunction, a permanent injunction, nominal damages, and attorneys' fees. The District answered that Palmer's shirt violated the dress code even though it did not pose a concrete threat of substantial disruption, was not sexually explicit, was not school-sponsored speech, and did not promote illegal drug use.

The district court held a hearing on May 8 on Palmer's motion for preliminary injunction. District Assistant Superintendent David Truitt testified that, four days before the hearing, the District had adopted a new dress code for the upcoming school year. Because of the new code, the court dismissed Palmer's motion without prejudice but asked the District for a copy of the new code.

On May 19, the District submitted its new dress code, which restricted more speech, including polo shirts with messages, shirts with professional sports team logos, and clothing with university messages. The policy continued to per-

---

[1] This version of the dress code did not allow students to wear messages on t-shirts unless they were in connection with a club, sports team, university, or school spirit. It allowed students to wear polo shirts with messages.

mit "campus principal-approved [District] sponsored curricular clubs and organizations, athletic teams, or school 'spirit' collared shirts or t-shirts." It also allowed logos smaller than two inches by two inches.[2]

After receiving the dress code, Palmer submitted three shirts to the District for approval. One was the original John Edwards for President t-shirt, one was a John Edwards for President polo shirt, and one was a t-shirt with "Freedom of Speech" on the front and the text of the First Amendment on the back. The District rejected all three.

Palmer again sued, and Truitt again testified, admitting that the dress code did not ban political pins, buttons, bumper stickers, or wrist bands and stating that those would be analyzed under the District's policy of not allowing any item that is distracting, sexually explicit, or promoted a violation of school rules. The district court determined that Palmer had not shown that he would suffer irreparable harm because of the dress code and denied a preliminary injunction.

## II.

We review the denial of a preliminary injunction for abuse of discretion. *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 163 (5th Cir. 1993). We evaluate *de novo* the legal principles on which the decision is grounded. *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d 765, 768 (5th Cir. 2007) (citation omitted). A district court should issue a preliminary injunction only if the plaintiff

---

[2] The District claimed that it adopted the stricter dress code to meet several problems. First, it had found that teachers and administrators spent too much time enforcing the old code, and the District believed the new one would be easier to enforce. Second, it banned professional sports shirts and university shirts because students had worn them to promote gang affiliation. Third, it found that neighboring school districts had used similar dress codes that had been successful. Finally, the District noted that it had considered adopting school uniforms but decided not to do so, because it still wanted students to have some freedom to chose their clothing.

establishes

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (citing *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006)). The district court examined only the second prong and concluded that Palmer did not "satisf[y his] burden of proving irreparable injury in light of the Court's determination that the school district will not [prevent Palmer] or other students from conveying political messages via bumper stickers affixed to their clothing, or buttons to do the same."

The "loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Deerfield Med. Ctr v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "[w]ords printed on clothing qualify as pure speech and are protected under the First Amendment," the dress code's ban on his shirts would cause Palmer irreparable injury. *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001) (citations omitted). The analysis is no different just because the code permits buttons and stickers. Therefore, the district court abused its discretion in deciding that the District's enforcement of the dress code could not irreparably harm Palmer.

## III.

### A.

Both parties ask that we examine the first prong, whether there is "a substantial likelihood of success on the merits." We may do so, because "it is an elementary proposition, and the supporting cases too numerous to cite, that this

court may affirm the district court's judgment on any grounds supported by the record." *United States v. Dunigan*, 555 F.3d 501, 508 n.12 (5th Cir.) (citation omitted), *cert. denied,* 129 S. Ct. 2450 (2009).

B.

Although students in public schools have First Amendment rights, this "constitutional protection is not absolute." *Canady*, 240 F.3d at 441. "[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 127 S. Ct. 2618, 2621 (2007) (citation omitted).

The Supreme Court has issued four major opinions on public school regulation of student speech. First, in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), a public school punished students who wore black armbands to school to protest the Vietnam War. *Id.* at 504. The Court confirmed that "students [do not] shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *id.* at 506, and "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511. Schools can restrict student speech only if it materially interferes with or disrupts the school's operation, *id.* at 512, and cannot "suppress 'expressions of feelings with which they do not wish to contend.'" *Id.* at 511 (citing *Burnside v. Byars*, 363 F.3d 744, 749 (5th Cir. 1966)).

Since *Tinker*, every Supreme Court decision looking at student speech has expanded the kinds of speech schools can regulate. In *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 687 (1986), the Court ruled that schools can prohibit "sexually explicit, indecent, or lewd speech." The Court held in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271-73 (1988), that schools can also regulate school-sponsored speech. Finally, in *Morse v. Frederick*, 127 S. Ct. 2618

(2007), the Court determined that schools can prohibit "[s]peech advocating illegal drug use." *Id.* at 2638 (Alito, J., concurring).

Palmer argues that under these decision, he wins on the merits. Reading *Tinker*, *Fraser*, *Hazelwood*, and *Morse* together, Palmer believes the Court has established a bright-line rule that schools cannot restrict speech that is not disruptive, lewd, school-sponsored, or drug-related. If this were the rule, Palmer indeed would prevail, because the District has stipulated that his shirts do not fall into any of these categories. Palmer's proposed categorical rule, however, is flawed, because it fails to include another type of student speech restriction that schools can institute: content-neutral regulations.

In *Canady*, the plaintiff presented this court with the same categorical argument that Palmer makes, in a facial challenge to a school uniform code. The plaintiff argued that uniforms violated the First Amendment because they banned student clothing that was not disruptive, lewd, or school-sponsored. Judge Parker, writing for the court, recognized that the Supreme Court had established these categories for situations in which schools were targeting specific speech but that content-neutral regulations "do not readily conform to [any] of the three categories addressed by the Supreme Court." *Canady*, 240 F.3d at 442. These cases all addressed "disciplinary action by school officials directed at the political content of student expression," not content-neutral regulations such as school uniforms. *Id.* at 442-43.

Because the regulation was content-neutral, we held that it should be analyzed under the rules of "the traditional time, place and manner analysis and the *O'Brien* test for expressive conduct." *Id.* at 443; *see United States v. O'Brien*, 391 U.S. 367 (1968). "Thus, the School Board's uniform policy will pass constitutional scrutiny if it furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary

to facilitate that interest." *Id.* (citation omitted). This court concluded that viewpoint- and content-neutral school dress codes should be reviewed under intermediate scrutiny.[3]

Palmer and *amici* vigorously argue that intermediate scrutiny should not apply to student speech, because the Supreme Court has never used that standard when reviewing such cases. The American Center for Law and Justice, as *amicus*, notes that *O'Brien* predates *Tinker*, and thus the Court implicitly rejected intermediate scrutiny for student speech cases when it declined to use it in *Tinker*. These arguments, however, overlook our rule of orderliness, which "forbids one of our panels from overruling a prior panel."[4] "Although it would be fair . . . to debate whether" intermediate scrutiny should ever apply to student speech, "that debate already took place"[5] in *Canady*, so we follow that decision. In addition, *Canady* has been followed by three other circuits[6] and has effectively become the national standard for analyzing content-neutral student speech.[7]

Palmer presents several arguments for why *Canady*, despite being our

---

[3] For the remainder of this opinion, we use "intermediate scrutiny" to refer to the time, place, manner, or *O'Brien*, tests referred to in *Canady*.

[4] *Pretus v. Diamond Offshore Drilling, Inc.*, 571 F.3d 478, 487 (5th Cir. 2009) (Smith, J., dissenting) (quoting *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 1999)).

[5] *Id.* at 488 (Smith, J., dissenting).

[6] *See Bar-Navon v. Brevard County Sch. Bd.*, 290 F. App'x 273, 276-77 (11th Cir. 2008); *Jacobs v. Clark County Sch. Dist.*, 526 F.3d 419, 428-32 (9th Cir. 2008); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 390-93 (6th Cir. 2005).

[7] Amicus Walter Bateman's request that we follow Judge Thomas's dissent in *Jacobs*—which suggests that "the Supreme Court has consistently focused on the *nature of the speech itself*," rather than the regulation—runs afoul of *Canady*. *See Jacobs*, 526 F.3d at 442-43 (Thomas, J., dissenting). That argument, moreover, does not properly distinguish between regulations that suppress specific speech and content-neutral regulations. In cases reviewing content-neutral time, place, manner restrictions, the Supreme Court has examined the regulations, not the speech being regulated. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791-803 (1989).

controlling precedent, should not apply in this case. First, he claims that Justice Alito's concurrence in *Morse* overruled *Canady*.[8] *Morse*, however, involved a school's targeting specific speech and did not concern content-neutral regulations. That distinction is critical and controlling. In addition, Justice Alito never mentioned *Canady* or any similar case and in fact recognized that *Tinker* "does not set out the only ground on which in-school student speech may be regulated." *Morse*, 127 S. Ct. at 2637 (Alito, J., concurring). Nothing in Justice Alito's concurrence or the majority opinion in *Morse* overruled *Canady*.[9]

Next, Palmer posits that *Canady* does not govern our case, because it examined a uniform code rather than a dress code. This is a distinction without a difference, because a uniform code is merely a strict version of a dress code.

Palmer's distinction would require that federal judges decide when a dress code is strict enough to be considered a uniform and would spawn endless line-drawing litigation. In addition, it would punish those school districts that adopt dress codes rather than uniforms because their students cannot afford uniforms. Also, such a rule would have the perverse result of pushing schools to adopt uniforms rather than dress codes that give students some clothing choice.

Palmer also argues that this case differs from *Canady* because it is an as-applied, rather than facial, challenge to the dress code. This fact does not change our standard of review. When analyzing time, place, and manner restrictions, we have used intermediate scrutiny for as-applied challenges, not just facial challenges.[10] The reason is obvious—to review facial challenges for a dress

---

[8] I n *Ponce v. Socorro Independent School District*, 508 F.3d 765, 768 (5th Cir. 2007), we recognized that Justice Alito's concurrence is "controlling" for our interpretations of *Morse*.

[9] Palmer's argument that our decision in *Ponce* overruled *Canady* is similarly incorrect. That case interpreted *Morse* and examined a school's suppression of dangerous speech, not content-neutral regulations.

[10] *See, e.g., United States v. Hicks*, 980 F.2d 963, 970-71 (5th Cir. 1992) (analyzing as-
(continued...)

code under intermediate scrutiny while reviewing as-applied challenges for strict scrutiny would make no sense and would effectively destroy any content-neutral regulation that could possibly ban political speech. Challenges to content-neutral dress codes, whether facial or as-applied, are reviewed under intermediate scrutiny.

In summary, because *Canady* survives *Morse* and applies to all content-neutral challenges, school regulation of student speech can be justified on five—not just four—grounds. If the speech is disruptive (*Tinker*), lewd (*Fraser*), school-sponsored (*Hazelwood*), or promoting drug use (*Morse*), schools may in some instances restrict specific student speech. Student speech can also be regulated so long as the regulation is viewpoint- and content-neutral (*Canady*).

### C.

We must decide whether the District's dress code is content-neutral. The District does not allow messages on shirts, but it exempts small logos on shirts and "campus principal approved" shirts that promote school clubs, organizations, athletic teams, or "school spirit." Palmer argues that the dress code's exemption for small logos and school-sponsored shirts by definition violates content-neutrality, because it distinguishes based on content. Similar allegedly-content-based dress code exceptions have been examined by three other federal courts and found to be content-neutral.[11]

Palmer's argument regarding content-neutrality has some judicial support.

---

[10] (...continued)
applied challenge to statute under intermediate scrutiny).

[11] *See Jacobs*, 526 F.3d at 432-33; *Lowry v. Watson Chapel Sch. Dist.*, 508 F. Supp. 2d 713, 719 (E.D. Ark. 2007), *aff'd*, 540 F.3d 752 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1526 (2009); *Long v. Bd. of Educ.*, 121 F. Supp. 2d 621, 625 n.5 (W.D. Ky. 2000), *aff'd*, 21 F. App'x 252 (6th Cir. 2001). *But cf. Blau*, 401 F.3d at 391 (noting that appellant did not argue content-neutrality of dress code that allowed for "any logos larger than the size of a quarter save for Highlands logos or other 'Highlands Spirit Wear'").

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642-43 (1994) (citations omitted). A dress code "is content based if . . . it differentiates based on the content of the speech on its face." *Jacobs*, 526 F.3d at 444 (Thomas, J., dissenting).

The District's code, however, is content-neutral. In its preeminent case on content-neutral regulation, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), the Court stated that "[t]he principal inquiry in determining content-neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." The Court has reiterated this principle.[12] "[A] regulation is generally 'content-neutral' if its restrictions on speech are not based on disagreement with the message it conveys." *Brazos Valley Coal. for Life, Inc. v. City of Bryan, Tex.*, 421 F.3d 314, 326-27 (5th Cir. 2005) (citations and footnote omitted).

The District was in no way attempting to suppress any student's expression through its dress code––a critical fact based on earlier student speech cases––so the dress code is content-neutral. Its allowance for school logos and school-sponsored shirts does not suppress unpopular viewpoints but provides students with more clothing options than they would have had under a complete ban on messages. We therefore employ intermediate scrutiny.

## D.

Under intermediate scrutiny, "the School Board's uniform policy will pass

---

[12] *See, e.g., Hill v. Colorado*, 530 U.S. 703, 719 (2000) (reaffirming *Ward*); *Turner*, 512 U.S. at 641 (stating that the First Amendment is concerned with "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas").

constitutional scrutiny [1] if it furthers an important or substantial government interest; [2] if the interest is unrelated to the suppression of student expression; and [3] if the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest." *Canady*, 240 F.3d at 443.[13] Palmer does not contend that the dress code violates the second prong but argues only on the first and third prongs.

Palmer asserts that the code does not further an important or substantial governmental interest. The code's preamble states that the code was adopted "to maintain an orderly and safe learning environment, increase the focus on instruction, promote safety and life-long learning, and encourage professional and responsible dress for all students." The District notes that the code would reduce administrative time spent enforcing the code and promote the school and its activities.

"Improving the educational process is undoubtedly an important interest." *Canady*, 240 F.3d at 443 (citation omitted). Improving student test scores and reducing disciplinary infractions qualify as important governmental interests. *Id.* Improving student performance, instilling self-confidence, increasing attendance, decreasing disciplinary referrals, and lowering the drop-out rate are all important governmental interests that meet the first prong's requirement. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 286 (5th Cir. 2001) (citations omitted). Importantly, this list of recognized interests is not exhaustive, and federal courts should give substantial deference to schools where they present their reasons for passing a given dress code.[14]

---

[13] The *O'Brien* test also requires that the government have the power to enact a given regulation, but in all dress codes cases this prong is, of course, automatically met. *See Jacobs*, 526 F.3d at 434 n.33.

[14] *See Hazelwood*, 484 U.S. at 267 ("'[T]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board,'
(continued...)

Under our precedents, the District's stated interests all qualify under the first prong. The stated benefits for the students, such as providing a safer and orderly learning environment and encouraging professional dress, are all sufficient interests. "[I]t is hard to think of a governmental interest more important than the interest in fostering conducive learning environments for our nation's children." *Jacobs*, 526 F.3d at 435-36. The benefits for the school, such as reducing time spent enforcing the code and promoting school spirit, are also important in promoting better education. The District and its administrators––not federal judges––are in a better position to formulate a dress code, and we are understandably hesitant to question their stated justifications. *See Canady*, 240 F.3d at 444.

The District has provided more than enough evidence to establish its important governmental interests. In *Canady* and *Littlefield*, this court properly set a low bar for the evidence a district must submit to show its dress code meets its stated goals. A statistical showing that the code has improved test scores or lowered disciplinary actions is sufficient. *Id.* at 443-44. Additionally, evidence of improvements in other districts that have adopted the same or a similar dress code can support the district's decision. *Littlefield*, 268 F.3d at 286 n.16.

We do not, however, require statistical or scientific evidence to uphold a dress code; improvements in discipline or morale cannot always be quantified. The sworn testimony of teachers or administrators would also suffice. Again, they are in a better position than are we to determine the benefits of the dress code. Here, Assistant Superintendent Truitt testified that the school board had

---

[14] (...continued)
rather than with the federal courts." (citing *Fraser*, 478 U.S. at 683); *Littlefield,* 268 F.3d at 287 ("[F]ederal courts should defer to school boards to decide, within constitutional bounds, what constitutes appropriate behavior and dress in public schools." (citations omitted); *Canady*, 240 F.3d at 444 ("[I]t is not the job of federal courts to determine the most effective way to educate our nation's youth.").

examined over forty other dress codes to see which would be the best fit for the District; the board took trips to see dress code enforcement in action and reviewed data regarding the impact of codes on other schools. This is more than enough to show that the District justified its important governmental interest with factual support.

Palmer does not take issue with the school board's claimed interests but instead argues that these interests do not apply, because the board's ban on shirts is undermined by allowing students to wear pins, buttons, wrist-bands, and bumper stickers containing messages. Generally, Palmer believes that allowing messages on buttons destroys the benefit of the dress code and its banning of messages on shirts.[15] For Palmer's objection to stand, however, he would have to show that the District's button allowance destroys all of the District's stated important governmental interests; if any of those stated benefits remain, then the dress code––button/shirt distinction and all––is valid.

The District's stated benefits function under this distinction. Because shirts are large and quite visible, banning them while allowing buttons would still cause less distraction and promote an orderly learning environment. Buttons and pins are also less prominent than are shirts and therefore require less attention from and regulation by teachers. Another District goal––promoting professional and responsible dress––still functions as well, because students are prepared for a working world in which pins and buttons may be appropriate at work but large, stark political message t-shirts usually are not.

Most importantly, even if, *arguendo*, we were to find the distinction between messages on shirts and messages on buttons odd, we recognize that the

---

[15] The court in *Jacobs*, 526 F.3d at 435, held that for the first prong of intermediate scrutiny, the court must take the government's stated interests at face value and cannot analyze the plaintiff's challenges to those interests. Because this position has no basis in law, we disagree with it and analyze Palmer's allegations that the dress code does not actually support the District's purported interests.

teachers and administrators who establish these rules know better than do we how the distinction will function in schools. "[F]ederal courts should defer to school boards to decide . . . what constitutes appropriate behavior and dress in public school." *Littlefield*, 268 F.3d at 287. The determination of where to draw lines on dress code decisions "properly rests with the school board, rather than with the federal courts." *Hazelwood*, 484 U.S. at 266 (citation, brackets, and internal quotation marks omitted).

Finally, we reject Palmer's "somewhat ironic[]" argument that the dress code "is an unconstitutional abridgment of speech because it does not abridge enough speech." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 540 (1981) (Stevens, J., dissenting in part). Under the current dress code, Palmer can come to school with a "John Edwards for President" button or First Amendment wristband and express his views through these devices. But Palmer requests that we strike down the dress code *because* the District gave him this avenue to express himself. He argues that, to survive intermediate scrutiny, the code must allow him no options at all.

We decline to follow this perverse reasoning. Under Palmer's rule, school districts would rush to impose the strictest dress codes possible or merely require school uniforms. Students such as Palmer would never be able to express their views through *any* medium. We eschew any legal principle that would lead to such a race-to-the-bottom.[16]

Also, because we review dress codes for intermediate scrutiny, such a rule would be particularly unreasonable. Under the third prong of intermediate scru-

---

[16] There are certain situations in which allowing more speech can cause a regulation to violate the First Amendment. Indeed, were the District's additional permitted speech specific to one particular viewpoint—say a rule that only allowed pro-abortion buttons—this could run afoul of the First Amendment. Our situation, however, is different: The District is not providing a right for student speech on a given topic, but instead is providing students a limited means to express their views on any topic.

tiny, the District must show that its dress code is no more strict than necessary to achieve its goals. In *Canady*, 240 F.3d at 443, we expressly noted that allowing speech through "other mediums during the school day" ensured that a dress code did not violate this third prong. Yet, under Palmer's argument, if a school allowed certain other speech mediums, in order to survive scrutiny under the third prong, that allowance could cause the entire code to fail under the first prong. We decline the invitation to impose such a Catch-22 on school districts.

Lastly, Palmer argues that the dress code fails under the third prong, which requires that "the incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the furtherance of that interest." *Turner*, 512 U.S. at 662. In *Canady*, however, we noted that a dress code passes this third prong so long as students "remain free to wear what they want after school hours" and "may still express their views through other mediums during the school day." *Canady*, 240 F.3d at 443. In addition, in *Littlefield*, 268 F.3d at 287, this court said that a dress code whose restrictions "pertain only to student attire during school hours and do not affect other means of communication" does not run afoul of the third prong. Thus, under our precedent, so long as a dress code does not restrict student dress outside of school and provides them with some means[17] to communicate their speech during school, it passes the third prong. The District's code fits easily within this rule, so it passes intermediate scrutiny.

In summary, Palmer has not shown a likelihood of success. There is no abuse of discretion, and the order denying a preliminary injunction is AFFIRMED.

---

[17] The means do not necessarily have to be related to messages on clothing or buttons. Instead, schools can allow students to communicate their messages through other avenues, such as orally at school or through their written work.