# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 19, 2011

No. 10-10722

Lyle W. Cayce
Clerk

CHARLES D. COOK, D/B/A COOK'S OILFIELD SERVICES,

Plaintiff-Appellant

v.

ADMIRAL INSURANCE COMPANY,

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:09-CV-00109

Before SMITH, WIENER, and OWEN, Circuit Judges.

PER CURIAM:[*]

MJ Brogdin Consulting Co. ("Brogdin") retained the services of Plaintiff-Appellant Charles D. Cook to deliver casing[1] and oversee its installation in Brogdin's oil well. During the execution of his work on the project, Cook

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] Casing is tubing or hollow pipe that comes in lengths or "joints" and is used to line the hole or "bore" of an oil well and to permit production when the drilling is finished and the well is "completed," to permit production of minerals from the well's productive zone. To avoid unnecessary delay, a maximum number of joints of casing are delivered to the drill site, and, after the depth for completion is determined, excess joints are removed from the site and returned to the supplier.

No. 10-10722

delivered casing to the drill site, but thereafter made a counting error that caused him to take away more of that casing, as excess, than he should have. This error in turn resulted in the completion of the well at an incorrect depth, shallower than the zone targeted for completion. Consequently, Brogdin incurred increased costs to have the well reworked and casing reinstalled to the correct depth. Cook sued his commercial general liability ("CGL") insurance carrier, Defendant-Appellee Admiral Insurance Company ("Admiral"), seeking a declaratory judgment that Admiral must (1) defend Cook in any lawsuit brought against him by Brogdin and (2) indemnify Cook for all damages awarded to Brogdin in such a suit.

Seeking a determination that it did not owe Cook a defense or indemnity, Admiral filed a motion for summary judgment, which the district court granted. The court reasoned that, because there was no "loss of use" of the Brogdin well, Cook's acts did not result in "property damage" under the terms of Admiral's policy, so Admiral had no duty to defend or indemnify Cook. We affirm the summary judgment, but for different reasons

## I.  FACTS & PROCEEDINGS

### A.  Facts

Cook purchased a CGL insurance policy from Admiral.  During the term of that policy, Brogdin retained Cook to deliver casing to the well and to oversee its installation in the well bore. In preparation for casing and completing the oil well, Cook was required to haul any excess casing away from the drill site. Cook made a counting error, however, and hauled away too much casing from the drill site. This resulted in an insufficient string of casing being installed in the well bore, causing the well to be completed ineffectively at a depth that was shallower than that of the zone intended for completion and production. This required Brogdin to have the well reworked before it could be completed at the correct

2

No. 10-10722

depth, costing Brogdin $336,745.63. Brogdin sued Cook in state court, claiming only that cost of reworking the well.

## B. Proceedings

Before he was sued by Brogdin, Cook notified Admiral of Brogdin's pre-suit claim. Admiral responded that, although the CGL policy provided $1 million in coverage, Cook could not recover more than $100,000 in damages because of an endorsement relating to underground work. This prompted Cook to sue Admiral in state court, seeking a declaratory judgment that the policy's full $1 million coverage was applicable to Brogdin's anticipated claim because Cook's work did not involve an underground equipment hazard. When, thereafter, Brogdin sued Cook, Admiral accepted Cook's defense under a reservation of the right to claim that it had no duty to defend or indemnify Cook against Brogdin's suit.

Admiral removed Cook's action to federal court and Brogdin intervened. Admiral then countersued Cook and Brogdin, seeking a declaratory judgment that its duty to indemnify Cook was limited to $100,000. Cook filed a motion for partial summary judgment on Admiral's counterclaim. Admiral then filed a motion for summary judgment, asserting that it had no duty to defend Cook in Brogdin's state court suit because Brogdin's claims against Cook were not within the scope of coverage of the CGL policy.

The district court granted summary judgment in favor of Admiral. It held that Admiral did not have a duty to defend Cook against Brogdin's lawsuit because Cook's actions did not result in a "loss of use of tangible property that is not physically injured," and that there thus was no "property damage" under the CGL policy.[2] The district court also ruled that, for the same reasons, Admiral did not have a duty to indemnify Cook, who then timely filed a notice of appeal.

---

[2] *Cook v. Admiral Ins. Co.*, No. 2:09-CV-0109-J, 2010 WL 2605256, at *2-4 (N.D. Tex. June 29, 2010).

3

No. 10-10722

## II.  ANALYSIS

### A.  Standard of Review

We review a district court's summary judgment de novo, applying the same legal standards as the district court.[3] Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] In our review, we may only consider the summary judgment record that was before the district court, viewing that evidence in the light most favorable to the non-moving party.[5]

### B.  Admiral Does Not Have a Duty to Defend Cook

Under Texas law, an insurer's duty to defend "is governed by the 'eight-corners' rule, whereby a court considers only the allegations in the underlying complaint and the terms of the insurance policy. If the petition filed against the insured, liberally construed, alleges facts within the scope of coverage, the insurer must defend."[6] In addition, the duty to defend "is determined by the underlying plaintiff's pleadings . . . without regard to the truth or falsity of those allegations," making "only two documents [ ] ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the underlying claimant. Facts outside the pleadings, even those easily ascertained, are ordinarily not material to the determination and allegations against the insured are liberally construed in favor of coverage."[7]

---

[3] *United States v. Caremark, Inc.*, 634 F.3d 808, 814 (5th Cir. 2011) (citation omitted).

[4] FED. R. CIV. P. 56(a).

[5] *Caremark*, 634 F.3d at 814 (citations omitted).

[6] *Lincoln Gen. Ins. Co. v. Aisha's Learning Center*, 468 F.3d 857, 858 (5th Cir. 2006) (citing *Nat'l Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997)).

[7] *Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 599-600 (5th Cir. 2006) (citing *GuideOne Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006)).

4

No. 10-10722

Here, Brogdin asserts in its complaint that it had contracted with Cook to "deliver and oversee the running of casing on a well" but that Cook had "removed more casing from the well site than it [sic] should, thereby resulting in a failure to complete the well to the desired depth, necessitating an expensive rework of the well, proximately causing damage to plaintiff." Based on these alleged facts, Brogdin makes two distinct legal claims—one based on a theory of breach of contract and the other based on a theory of negligence—contending that under each theory Cook "must reimburse [Brogdin] for the funds paid by [Brogdin] to mitigate damages caused by [Cook], to the damage of [Brogdin]." We now must determine in our de novo review whether Brogdin has made allegations against Cook that fall within the scope of coverage of Admiral's CGL policy.

### 1. "Loss of Use of Tangible Property That Is Not Physically Injured"

The CGL policy requires Admiral to defend Cook against any suit seeking "damages because of 'bodily injury' or 'property damage' to which this insurance applies."[8] The policy further provides that "[t]he insurance applies to [ ] 'property damage' only if: The [ ] 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . ." And an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same harmful conditions." The Texas Supreme Court has agreed with our earlier assessment that "'claims for damage caused by an insured's defective performance or faulty workmanship' may constitute an 'occurrence' when 'property damage' results from the 'unexpected, unforeseen or undesigned happening or consequence' of the insured's negligent behavior"[9]—regardless of

---

[8] The parties do not dispute that Brogdin does not allege "bodily injury" in this case.

[9] *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007) (quoting *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 725 (5th Cir. 1999)).

No. 10-10722

whether the occurrence injures a third party's property or the insured's work.[10] The Texas Supreme Court has also explained that "[a]n accident is generally understood to be a fortuitous, unexpected, and unintended event" and has cited, as an example, "[t]he wrong number of boxes was shipped because someone made a mistake in counting."[11]

Here, Cook's "remov[al] [of] more casing from the well site than [he] should" (because someone made a mistake in counting) was an "occurrence" under the terms of the CGL policy, as construed by the Texas Supreme Court.[12] The question then is whether the resulting damage alleged by Brogdin—the "failure to complete the well to the desired depth"—constituted "property damage" under Admiral's policy.

That CGL policy defines "property damage" disjunctively as:

(a)    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

(b)    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

In the district court, Cook assumed that Brogdin's alleged facts fit into the CGL policy under subsection (b) alone, i.e., the "loss of use" definition of "property damage." The district court determined, however, that for there to be "*loss of use* of tangible property," the tangible property—here, the well—must have been *in use* prior to the damage.[13] The court observed: "The well completed

---

[10] *Id.* at 9 ("The CGL policy, however, does not define an 'occurrence' in terms of the ownership or character of the property damaged by the act or event. Rather, the policy asks whether the injury was intended or fortuitous, that is, whether the injury was an accident.").

[11] *Id.* at 8 (quotation marks and citations omitted).

[12] *See id.*

[13] *Cook*, 2010 WL 2605256, at *3.

at the specified depth had not only not been used but could not have been used. It was not poised ready to put in action or service. It simply did not exist at the time of the breach or when the reworking was done."[14] Based on that analysis, the district court concluded that Cook's actions did not result in "loss of use" of an *existing* well.[15] The court went on to note that "even if the policy did cover damages for the loss of use of something that had not yet been created, the Brogdin lawsuit *does not allege* damages for loss of use."[16] We need not pursue this further, however, because we affirm on different grounds.

### 2.  "Property Damage" Exclusions

Although the CGL policy does generally require Admiral to defend against any suit seeking damages from Cook for "property damage," section j of the policy expressly excludes coverage of:

> "Property damage" to:
> . . .
> (5) That particular part of real property on which you . . . are performing operations if the "property damage" arises out of those operations; or
> (6) That particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it.

Here, the "property damage," i.e., the completion of the well at an incorrect depth, undeniably *arose out of* Cook's operations; and it was precisely that well which had to be reworked because Cook's negligence in retrieving too much casing from the site left an insufficient quantity of casing to reach the proper depth for completion. Moreover, Cook then oversaw the running of that insufficient casing. Relying on *Mid-Continent Casualty Co. v. JHP Development,*

---

[14] *Id.*

[15] *Id.*

[16] *Id.* (emphasis added).

No. 10-10722

*Inc.*,[17] Cook insists that exclusion j(5) is inapplicable because, temporally speaking, "there was a gap between the occurrence and loss of use." In that opinion, we addressed this same CGL policy exclusion, recognizing that "exclusion j(5) makes clear that the exclusion only applies to property damage that occurred during the performance of construction operations" and concluding that the exclusion did not apply in that case because the property damage "occur[red] during a prolonged, open-ended, and complete suspension of construction activities."[18] Cook attempts to liken *Mid-Continent* to the instant case by identifying the "occurrence" as the removal of the casing and then arguing that the property damage "occurred after the occurrence was performed, when the casing was run." This analysis, however, misses the point of our holding in *Mid-Continent* and misses the factual distinction between that case and this one. The plain language of exclusion j(5) makes it applicable to property damage that "arises out of" operations that take place while the insured is "performing operations." That is why exclusion j(5) did not apply in *Mid-Continent* to damage caused during a suspension of construction activities. Here, in contrast, there was no suspension of construction activities: The well was completed to the incorrect depth, i.e., damaged, *while* Cook was "deliver[ing] and oversee[ing] the running of casing on [the] well," as his "work" was characterized in Brogdin's complaint.

Cook likewise asserts that exclusion j(6) is inapplicable because "the defective work was the removal of casing, [and] the loss of use was to the well, a separate property." But, this analysis too strays from the plain text of the exclusion. In *Mid-Continent*, we explained that "[t]he plain meaning of the exclusion . . . is that property damage only to parts of the property that were

---

[17] 557 F.3d 207 (5th Cir. 2009).

[18] *Id.* at 213.

themselves the subjects of the defective work is excluded."[19] In the instant case, Cook was hired to (1) provide casing for the well as an integral part of the drilling and completion of the well as a whole *and* (2) oversee the running of the casing that he provided. As Admiral notes, casing "is not a component of a well that functions independently, and without which the rest of the well would continue to function."[20] Therefore, because Cook negligently recovered and hauled off too much of the casing from the well site where he had delivered it—thus furnishing a net amount of casing insufficient to reach the target depth for the completion of the well—he caused defects in the "construction" of the well as a whole when he oversaw the installation of that deficient quantity of casing. These circumstances are distinguishable from those of defective repair work (performed after a well is constructed) that causes damage only to the casing, as a pre-installed component of the finished well.[21] By contrast, there was here no domino effect of damage to the entire well triggered by Cook's defective work on one independent working part of the well; rather, Cook's work was performed during the overall drilling and completion operation of the well and thus caused damage to the entire well when his work was incorrectly performed.

Although the district court did not grant summary judgment in favor of Admiral on the basis of exclusions j(5) and j(6), we have recognized that we may

---

[19] *Id.* at 215.

[20] This is simply *not* a situation in which the insured's work was to be performed on a discrete independent component of a whole piece of property, and its defective work on that one component caused damage to other components of the whole property. *See Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 371-72 (5th Cir. 2008) (holding that when the insured was hired for "engineering of an in-flight entertainment/cabin management system," exclusion j(6) only "exclude[d] coverage for the damage to the IFE/CMS itself (or, perhaps, the electrical system) but not the rest of the Aircraft and the ensuing loss of use damages").

[21] *See, e.g., Underwriters at Lloyd's London v. OSCA, Inc.*, Nos. 03-20398, 03-20817, 03-21021, 2006 WL 941794, at *18-19 (5th Cir. 2006) (per curiam) (unpublished).

No. 10-10722

affirm a district court's judgment for reasons—supported by the record—other than those relied on by the district court.[22] We may, therefore, properly consider whether any of the Admiral policy's exclusions apply to coverage in this case because the entire CGL policy, including exclusions j(5) and j(6), is part of the record. Cook contends that Admiral has waived any argument based on these policy exclusions because, under Texas law, a policy exclusion is an affirmative defense,[23] and failure to raise an affirmative defense generally constitutes waiver.[24] But, we have also made clear that "there is some play in the joints" of that general rule, and "'a defendant does not waive an affirmative defense if it is raised at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'"[25] We have, for example, upheld a summary judgment in favor of an insurer based on an affirmative defense that the insurer did not plead.[26]

Here, the parties' dispute turned primarily on whether Cook's negligence, as alleged by Brogdin, caused "property damage" under the policy's "loss of use" definition. The district court determined that it did not, thereby denying that Admiral had a duty to defend, and the court stopped its analysis at that point. Because the court thus determined that there was no policy coverage in the first

---

[22] *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009) (citing *United States v. Dunigan*, 555 F.3d 501, 508 n.12 (5th Cir. 2009)), *cert. denied*, 130 S. Ct. 1055 (2010); *LLEH, Inc. v. Wichita County, Tex.*, 289 F.3d 358, 364 (5th Cir.), *cert. denied*, 537 U.S. 1045 (2002).

[23] TEX. INS. CODE § 554.002 ("Language of exclusion in the contract or an exception to coverage claimed by the insurer or health maintenance organization constitutes an avoidance or an affirmative defense.").

[24] *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008).

[25] *Id.* at 385-86 (quoting *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007)) (alteration in original).

[26] *Standard Waste Sys. Ltd. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398 (5th Cir. 2010).

10

place, it had no reason to question whether any of the policy's exclusions might apply. As we found that ruling to raise a difficult question, however, and believed the policy-exclusion question to be rather straightforward, we requested that both parties submit supplemental letter briefs addressing the applicability of the policy's two exclusions, which to us seemed relevant to the facts of this case. Cook thus had an adequate opportunity to respond and to refute the applicability of the exclusions; and, indeed, he took only two days, of the seven we allowed, to do so. Now that we have reviewed both Cook's and Admiral's responding analyses on this issue, we are satisfied that Cook was not prejudiced by our sua sponte raising of this issue,[27] and we are now convinced that these exclusions provide the correct legal basis on which to affirm the district court's summary judgment.

In sum, the property damage alleged by Brogdin in its complaint falls squarely within these two "property damage" exclusions—j(5) and j(6)—of the CGL policy. This, in turn, relieves Admiral of any duty to defend Cook in the action brought against him by Brogdin.

## C. Admiral Does Not Have a Duty to Indemnify Cook

Under Texas law, an insurer's duty to *indemnify* "is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*."[28] Admiral's CGL policy provides that it "will pay those sums that [Cook] becomes legally obligated to pay as damages because of [ ] 'property damage' to which this insurance applies." As we have determined that the CGL policy does not apply

---

[27] Federal Rule of Civil Procedure 56 does not limit district courts or courts of appeals to granting summary judgment based on grounds asserted by the parties.

[28] *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (emphasis in original).

to the type of "property damage" alleged by Brogdin, Admiral does not have a duty to indemnify Cook for the same reasons that it does not have a duty to defend him.

### III.  CONCLUSION

For the foregoing reasons, the district court's summary judgment relieving Admiral of any duty to defend or indemnify Cook is, in all respects, AFFIRMED.

No. 10-10722

OWEN, Circuit Judge, concurring.

I respectfully concur in the judgment only. The panel majority's decision is based on arguments that neither Admiral Insurance Company nor Cook advanced in the district court, nor were these arguments raised in this court until supplemental briefing was requested by our court. Respectfully, our jurisprudence does not allow us to affirm a summary judgment on *any* grounds, but rather only on the basis of any arguments advanced below. Admiral is entitled to summary judgment, however, since the events giving rise to the underlying suit against Cook fall outside the scope of Cook's insurance policy. Admiral did advance this basis for summary judgment, both in the district court and in our court.

## I

Cook acquired a general commercial liability insurance policy from Admiral. Cook contracted with M. J. Brogdin to deliver and oversee the running of casing for an oil well. In the course of that job, Cook made an error, and Brogdin sued. Brogdin's two-page petition filed in state court alleged that Cook "removed more casing from the well site than [he] should, thereby resulting in a failure to complete the well to the desired depth." Brogdin's suit sought damages as a result. Cook filed the instant suit against Admiral, seeking a declaratory judgment that Admiral was required to defend and indemnify him from Brogdin's claims.

The district court granted summary judgment in favor of Admiral. Among Admiral's arguments for summary judgment, though not the basis of the district court's decision, was the limited scope of the coverage set forth in the "classifications" section of the insurance policy. Admiral did not advance an

argument on the basis of the "property damage" exclusions relied upon by the panel majority.[1]

## II

The panel majority resolves this case on the basis of two "property damage" exclusions in the policy.[2] The panel majority concludes that the district court's grant of summary judgment may be affirmed on the basis of these exclusions—which were not addressed by the parties until our request for supplemental briefing on appeal—because "we have recognized that we may affirm a district court's judgment for reasons—supported by the record—other than those relied on by the district court."[3]

Our court, however, has recognized limits on the reach of that general proposition. For instance, in *Johnson v. Sawyer*, we stated, "Although we can affirm a summary judgment on grounds not relied on by the district court, those grounds must at least have been proposed or asserted in that court by the movant."[4] Yet here, the panel majority relies upon exclusions that were never asserted in the district court.

In *LeMaire v. Louisiana Department of Transportation & Development*, we recognized that the limits placed upon our summary judgment affirmance rule are intertwined with the general limits we place upon the scope of our consideration on appeal: "we may only affirm an order granting summary judgment on a basis that was presented to the district court. This is in keeping

---

[1] *Ante*, at 11.

[2] *Id.*

[3] *Id.* at 9-10 (citing *Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009); *LLEH, Inc. v. Wichita Cnty., Tex.*, 289 F.3d 358, 364 (5th Cir. 2002)).

[4] 120 F.3d 1307, 1316 (5th Cir. 1997) (citing *Mo. Pac. R.R. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 538 (5th Cir. 1994), *F.D.I.C. v. Laguarta*, 939 F.2d 1231, 1240 (5th Cir. 1991), and *Frank C. Bailey Enter., Inc. v. Cargill, Inc.*, 582 F.2d 333, 334 (5th Cir. 1978)).

with our precedent that arguments not raised before the district court are waived and cannot be raised for the first time on appeal."[5]  Accordingly, the general proposition relied upon by the panel majority comes into tension with another of our court's general propositions, stated—perhaps most succinctly—in another context by our en banc court: "It goes without saying that we are a court of review, not of original error.  Restated, we review only those issues presented to us; we do not craft new issues or otherwise search for them in the record."[6] We have recognized that "[i]t is for the parties, those who have a stake in the litigation, to decide which issues they want to pursue, at trial and on appeal."[7] As our en banc court recognized, "it is not for us to decide which issues should be presented, or to otherwise try the case for the parties."[8]  Here, because the parties chose—on the basis of their own assessments—to address other provisions contained in the policy, we should not relitigate the case for them.

### III

There is, however, an alternative ground on which summary judgment may be affirmed that the parties did raise, both below and in their briefing to this court.  Admiral contends that the claims asserted by Brogdin's suit against Cook fall outside the scope of Cook's policy.  To determine the scope of Admiral's duty to defend under Texas's "eight corners" rule, we compare the facts alleged in Brogdin's petition to the language of the policy.[9]

---

[5] 480 F.3d 383, 387 (5th Cir. 2007) (internal citation omitted).

[6] *United States v. Brace*, 145 F.3d 247, 255 (5th Cir. 1998) (en banc).

[7] *Id.* at 256.

[8] *Id.*

[9] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (per curiam).

No. 10-10722

The underlying state-court petition states that Cook "removed more casing from the well site than [he] should, necessitating an expensive rework of the well." On appeal, Cook explains that this was an "oversight" and cites to a description of this oversight as arising "when Cook's employees miss counted [sic] casing joints." However, the insurance policy contains an endorsement that "[t]his insurance applies to . . . 'property damage' . . . arising only out of those operations which are described by the classification shown on the Commercial General Liability Coverage Declarations, its endorsements[,] and supplements." The "Commercial General Liability Coverage Part" includes the following "Classification[s]":

> OIL OR GAS LEASE WORK BY CONTRACTORS—OILFIELD LEASE ROAD AND DITCH MAINTENANCE, EXCAVATION AND BEAUTIFICATION OF OILFIELD LEASE SITE—NOT LEASE OPERATIONS—OILFIELD WATER STEAM CLEANING OF TANKS AND SMALL TANKS WITH PRESSURE WASHER WITH PSI OF 2500 OR LESS—NOT LEASE OPERATIONS OCCASIONAL SHOP WELDING—EXCLUDING ANY WORK ON EXISTING LINES[.]

> OIL OR GAS CONTRACTOR'S EQUIPMENT RENTED TO OTHER[S] (EXCLUDING ANY SELF-PROPELLED VEHICLES OR AUTOS) WITHOUT OPERATORS—NO IN-HOLE EQUIPMENT (PRODUCTS/COMPLETED OPERATIONS ARE INCLUDED IN THE GENERAL AGGREGATE LIMIT)[.]

> SUB-CONTRACTED WORK ONLY TO OTHER INSURED INDEPENDENT CONTRACTORS, OIL OR GAS WORK IN THE FIELD[.][10]

The events for which Cook seeks coverage fall outside of the scope of the text. We must be mindful of the directive under Texas law that "courts must strive to give effect to the written expression of the parties' intent" in

---

[10] The original appears to use en-dashes instead of em-dashes or hyphens. This has been corrected without brackets for clarity.

interpreting an insurance policy.[11] Moreover, to determine the scope of coverage "the court must focus on the factual allegations that show the origin of the damages rather than on the legal theories alleged."[12] Reading the classifications as a whole, nothing listed in the policy's coverage extends to the facts pled: the erroneous removal of casing from the site that hindered the completion of the well at the desired depth.

Nevertheless, Cook argues that the erroneous removal of the casing falls under the phrase "oil or gas lease work by contractors" in the classification. But that phrase is followed by a dash and references to lease road and ditch maintenance and the excavation and beautification of the oilfield lease site. Cook's "remov[al of] more casing from the well site than [he] should" bears no resemblance to the policy's statements of coverage. Cook's allegedly erroneous acts are wholly unconnected to maintaining lease roads or ditches. Similarly, one cannot say that Cook's erroneous removal of the pipe was done to beautify or excavate the site: as Cook concedes, the casing was improperly removed owing to an "oversight," a function of a counting error. Moreover, if "lease work by contractors" were to extend coverage to *all* activities undertaken by Cook in the course of his business—as Cook appears to contend—there would be no need for the examples following the dash. Indeed, the Supreme Court of Texas has held that "courts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section" of

---

[11] *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) (citation omitted).

[12] *Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d at 141 (internal quotation marks and citation omitted).

No. 10-10722

an insurance policy.[13]  Reading the classifications as a whole, the removal of the casing falls outside of the policy's scope and, thus, coverage does not attach.[14]

Alternatively, Cook argues that this section of the insurance contract is unclear and should be construed against Admiral.  He relies upon *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. Hudson Energy Co.*[15] There, the Supreme Court of Texas held that "if a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured."[16] Cook's reliance is misplaced, however, because that case made clear that "[i]f the written instrument is worded so that it can be given only one reasonable construction, it will be enforced as written."[17] That is the situation in the instant case.  The classifications list types of work that will be covered—for instance, the renting of Cook's non-self-propelled equipment to others—and types of work that will explicitly not be covered—for instance, certain lease operations.  As discussed above, the policy may only be reasonably interpreted by reading the examples following the dashes as cabining the preceding language.  This explains the dual listings of non-coverage for "lease operations."  If the first listing of "lease operations" was not limited by reference to the cleaning of tanks, there would be no need to list it again with reference to shop welding.

Because the only reasonable interpretation of the classifications of Cook's policy would not extend coverage to the events at issue, "it will be enforced as

---

[13] *State Farm Life Ins. Co.*, 907 S.W.2d at 433 (citation omitted).

[14] *E.g.*, *Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d at 141 (holding that the negligent discharge of a firearm while in a truck did not fall within the scope of an insurance policy covering injury "'resulting from the ownership . . . of a covered auto'").

[15] 811 S.W.2d 552 (Tex. 1991).

[16] *Id.* at 555 (citations omitted).

[17] *Id.* (citation omitted).

written."[18]  For the same reasons Admiral has no duty to defend, it has no duty to indemnify.[19]

## IV

Cook contends that Admiral waived its argument relying upon the classifications limiting the scope of the policy by waiting to raise this issue until Admiral's motion for summary judgment below.  Cook theorizes that this delay constitutes waiver, since he construes this language as constituting an affirmative defense.  Even assuming this were an affirmative defense, there is no waiver.  We have previously held that "a defendant does not waive an affirmative defense if it is raised at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond."[20]  Cook does not argue to this court that he was prejudiced by the delay, nor is prejudice apparent.  Moreover, we have previously held that a purely legal issue raised following relevant testimony at trial was asserted at a "pragmatically sufficient time."[21]  Under Texas law, the interpretation of an insurance contract is also a question of law.[22]  On the facts presented here, there is similarly no waiver.

**＊ ＊ ＊**

I respectfully concur in the judgment only.

---

[18] *Id.* (citation omitted).

[19] *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997) (per curiam).

[20] *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008) (internal quotation marks, brackets, and citation omitted).

[21] *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986).

[22] *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 562 (5th Cir. 2010).