IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 28, 2009

Charles R. Fulbruge III
Clerk

No. 05-50796

MID-CONTINENT CASUALTY CO.,

Plaintiff-Counter Defendant-Appellant,

v.

JHP DEVELOPMENT, INC.,

Defendant-Appellee,

TRC CONDOMINIUMS, LTD.,

Defendant-Counter Claimant-Appellee.

Appeal from the United States District Court
for the Western District of Texas, San Antonio

Before BENAVIDES, SOUTHWICK, and HAYNES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

In this insurance coverage suit, appellant Mid-Continent Casualty Co. ("Mid-Continent") sued appellees JHP Development, Inc. ("JHP") and TRC Condominiums, Ltd. ("TRC"), seeking a declaratory judgment that it had no duty to defend or indemnify JHP or pay any damages awarded to TRC in a state court suit between those two parties stemming from JHP's defective construction of a five-unit condominium project in San Antonio, Texas. The district court held that Mid-Continent had a duty to defend and indemnify JHP pursuant to a commercial general liability insurance policy issued by Mid-Continent. Mid-

Continent appeals the district court's holding that two coverage exclusions contained in the insurance policy do not apply to the damages sought by TRC and that the default judgment in the underlying suit is binding on Mid-Continent. For the reasons stated below, we AFFIRM.

I. Background

TRC and JHP entered into an agreement for the construction of the condominium project on January 27, 1999. The agreement called for the construction of a four-story, wood-frame structure with partial concrete and masonry bearing walls at the first floor/garage level, supported by a concrete slab-on-grade foundation. The structure was divided into five units, with one designated as a model. With the exception of the model, the construction plans called for the units to remain partially unfinished until they were sold, so that the new owner could choose the finish for the unit. Excavation began in July 1999, the foundation was poured and completed in the fall of 1999, and concrete masonry unit (CMU) firewalls were installed in the spring of 2000. The model unit was completed in spring 2001. At that time, the remaining units still required painting, flooring, plumbing and electrical fixtures, and the activation of the HVAC system.

Due to JHP's failure to properly water-seal the exterior finishes and retaining walls, large quantities of water penetrated the interior of the structure through ceilings and walls, under doors, and at other points, damaging contiguous building materials and interior finishes, including interior drywall, stud framing, electrical wiring, and wood flooring, prior to the final completion of the project. The water intrusion problems started some time in the summer or fall of 2001. As a result of the damage and JHP's refusal to repair the damage and complete the work, TRC terminated its construction agreement with JHP.

On December 12, 2002, TRC retained a contractor to repair and complete the condominiums. The repair and completion of the project cost $2,255,578.53.

The contractor attributed $438,466.77 of that amount to investigating, demolishing, repairing, and replacing the non-defective interior finishes and wiring that were damaged by the water intrusion.

JHP notified Mid-Continent of the problems with the TRC project and sought coverage under Commercial General Liability Insurance Policy No. 04-GL000062972 issued by Mid-Continent to JHP and effective from September 24, 2001 to September 24, 2002. On May 1, 2003, Mid-Continent denied coverage, claiming that there was no "occurrence" or "property damage" as defined under the insurance policy, and that various exclusions were applicable. In October 2003, TRC sued JHP for breach of contract, breach of warranty, negligence, and attorney's fees. JHP timely submitted the petition to Mid-Continent. Mid-Continent again denied JHP's request for coverage and refused to provide a defense. On December 22, 2003, a default judgment in excess of $1.5 million was entered against JHP.

Mid-Continent filed this declaratory judgment action seeking a declaration that: (1) JHP was not entitled to coverage; (2) Mid-Continent had no duty to defend or indemnify JHP; (3) TRC was not entitled to any sums as a third-party beneficiary or judgment creditor; and (4) the default judgment was not binding on Mid-Continent. Mid-Continent moved for summary judgment, asserting that there was no "occurrence" or "property damage" as defined under the insurance policy, that various policy exclusions were applicable, and that the default judgment in the underlying suit was not binding on Mid-Continent because that suit was not a fully adversarial proceeding and Mid-Continent had no duty to defend JHP. TRC filed a counterclaim alleging that it was entitled to indemnity for the default judgment against JHP and its attorney's fees in this suit as a judgment creditor and that it was entitled to relief for breach of contract as a third party beneficiary to the insurance contract. TRC moved for summary judgment on the grounds that there was an "occurrence" and "property damage"

3

as defined under the insurance policy and that none of the policy exclusions applies to the property damage for which it sought to recover, specifically damage to the interior portions of the condominiums that resulted from JHP's failure to properly water-seal the exterior finishes and retaining walls. JHP failed to answer this suit, and Mid-Continent sought a default judgment against JHP.

The district court granted TRC's motion for summary judgment and denied Mid-Continent's motion for summary judgment, finding that there was an "occurrence" and "property damage" as defined under the insurance policy, that none of the policy exclusions applied to the damages sought by TRC, and that the default judgment in the underlying suit was binding on Mid-Continent. The court found that Mid-Continent owed indemnity to TRC in the amount of $438,466.77 and TRC's reasonable attorney's fees. The district court denied Mid-Continent's motion for default judgment against JHP.

Mid-Continent appeals the district court's holding that two of the policy exclusions, exclusion j(5) and exclusion j(6), do not apply to the damages sought by TRC.[1] Exclusion j(5) excludes property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." Exclusion j(6) excludes property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." This exclusion further provides that it "does not apply to 'property damage' included in the

---

[1] Mid-Continent has abandoned its argument that there was no "occurrence" or "property damage" as defined under the insurance policy in light of the Texas Supreme Court's decision in Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1 (Tex. 2007), in which that court rejected Mid-Continent's arguments regarding the meaning of those terms, holding that defective construction or faulty workmanship that injures only a general contractor's own work may constitute an "occurrence" causing "property damage" under the policy. Id. at 7–16. This appeal had been stayed pending the resolution of that case.

'products-completed operations hazard.'" "Your work" is defined, in relevant part, as "work or operations performed by you or on your behalf." Both exclusions are "business risk" exclusions, common features in commercial general liability insurance policies that are designed to exclude coverage for defective work performed by the insured. See Hartford Casualty Co. v. Cruse, 938 F.2d 601, 603 (5th Cir. 1991) (citing T.C. Bateson Const. Co. v. Lumbermens Mut. Cas. Co., 784 S.W.2d 692, 694–95 (Tex. App. 1989)) (discussing the purpose of business risk exclusions); Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 670 (Tex. App. 2006) (same); see also Farmington Cas. Co. v. Duggan, 417 F.3d 1141, 1142 (10th Cir. 2005) (citations omitted) ("The purpose of a commercial general liability policy is to protect the insured from liability for damages when his own defective work or product damages someone else's property. Damage to an insured's own work resulting from his faulty workmanship on it is usually covered by a performance bond, not a commercial general liability policy."); Robert J. Franco, Insurance Coverage For Faulty Workmanship Claims Under Commercial General Liability Policies, 30 Tort & Ins. L.J. 785, 785 (Spring 1995) ("[C]ommercial general liability insurance policies cover only 'insurable risks' and exclude business risks."). Mid-Continent also appeals the district court's holding that the default judgment in the underlying suit was binding on Mid-Continent. The parties do not dispute that Texas law applies to this diversity suit.

II.    The Applicable Legal Standards

A.    The Standard of Review

This court reviews a district court's grant of summary judgment de novo, applying the same standards as the district court. See XL Specialty Ins. Co. v. Kiewit Offshore Services, Ltd., 513 F.3d 146, 149 (5th Cir. 2008); Hirras v. Nat'l R.R. Passenger Corp., 95 F.3d 396, 399 (5th Cir. 1996). Summary judgment is proper if the record reflects "that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

B.      Interpretation of Insurance Policies Under Texas law

Under Texas Law, insurance policies are construed as are contracts generally, and must be interpreted to effectuate the intent of the parties at the time the contracts were formed. Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998); Glover v. Nat'l Ins. Underwriters, 545 S.W.2d 755, 761 (Tex. 1977). When the words of a policy are unambiguous, they are to be given their plain, ordinary, and generally accepted meaning, unless the policy clearly indicates that the contractual terms have been used in a different or technical sense. Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984). However, when the language of a policy is susceptible to more than one construction, it should be construed strictly against the insurer and liberally in favor of the insured. Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 666 (Tex. 1987). Where the question of interpretation involves an exception or limitation on the insurer's liability under the policy, an even more stringent construction is required. Id.

C.      The Duty to Defend and the Duty to Indemnify Under Texas Law

In Texas, the eight-corners rule provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from the terms of the policy and the pleadings of the third-party claimant. Resort to evidence outside the four corners of these two documents is generally prohibited. GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church, 197 S.W.3d 305, 307 (Tex. 2006). The duty to defend does not depend upon the truth or falsity of the allegations; a plaintiff's factual allegations that potentially support a covered claim are all that is needed to invoke the insurer's duty to defend. Id. at 310

(citing Heyden Newport Chem. Corp. v. S. Gen. Ins. Co., 387 S.W.2d 22, 26 (Tex. 1965)).

The duty to defend is distinct from, and broader than, the duty to indemnify. Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co., 141 S.W.3d 198, 203 (Tex. 2004). The facts actually established in the underlying suit control the duty to indemnify. GuideOne Elite Ins. Co., 197 S.W.3d at 310 (citations omitted).

## III. Exclusion j(5)

The parties agree that the use of the present tense "are performing operations" in exclusion j(5) makes clear that the exclusion only applies to property damage that occurred during the performance of construction operations by JHP, but the parties dispute whether JHP was in fact "performing operations" when the water intrusion occurred. TRC argues JHP was not "performing operations" at the time of the damage because construction operations had been suspended and were not actively occurring over the period of time during which the water intrusion occurred. Mid-Continent argues that JHP was performing operations at the time of the damage because the project had not yet been completed—four units remained unfinished.

The ordinary meaning of "performing operations" is the active performance of work. See XI The Oxford English Dictionary 545 (2d ed. 1991) (defining "performing" as "[c]arrying out, execution, doing, performance"); see also Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 11 (Tex. 2007) (citing Lennar Corp., 200 S.W.3d at 686–87; CU Lloyd's of Tex. v. Main Street Homes, 79 S.W.3d 687, 696 (Tex. App. 2002)) (stating that exclusion j(5) "applies while operations are being performed"). The prolonged, open-ended, and complete suspension of construction activities pending the purchase of the condominium units does not fall within the ordinary meaning of "performing operations." This was not merely a brief, temporary halt, such as that which might occur at the

conclusion of each workday or during several days of inclement weather, but rather a total cessation of active construction work for the foreseeable future. Although JHP intended to eventually complete construction work once the units were sold, an actor is not actively performing a task simply because he has not yet completed it but plans to do so at some point in the future.

The cases cited by Mid-Continent are consistent with the interpretation that exclusion j(5) applies only to damage caused during active physical construction activities; none of those cases holds or suggests that the exclusion applies to damage caused during a prolonged suspension of active construction work. See Admiral Ins. Co. v. Little Big Inch Pipeline Co., Inc., 523 F. Supp. 2d 524, 541 (W.D. Tex. 2007) (finding that exclusion applied to debris from excavation work); Jim Johnson Homes, Inc. v. Mid-Continent Casualty Co., 244 F. Supp. 2d 706, 710–11, 717 (N.D. Tex. 2003) (finding that exclusion would apply to property damage incurred during active physical construction of house); Lennar, 200 S.W.3d at 686 ("American Dynasty cites no evidence that the water damage to the homes occurred while Lennar was building the homes. To the contrary, the evidence reflects that the damage began shortly after the homes were completed."); CU Lloyd's of Tex., 79 S.W.3d at 719 (finding that exclusion did not apply to damage that occurred after construction had been completed).

The undisputed summary judgment evidence shows that JHP was not actively engaged in construction activities at the time the water intrusion occurred. Construction had been suspended pending the purchase of the condominium units. Under these facts, exclusion j(5) does not apply.

IV. Exclusion j(6)

TRC argues that the "[t]hat particular part" language in exclusion j(6) makes clear that the exclusion only applies to damage to the part of the condominium project that was itself the subject of the defective work that caused property damage (the exterior portions of the condominiums that were not

adequately waterproofed), not to other parts of the condominium project that were damaged as a result of the defective work but were not themselves the subject of the defective work (the interior drywall, stud framing, electrical wiring, and wood flooring). Mid-Continent argues that the exclusion covers all property damage to the condominium project that resulted from JHP's defective work on the project.

Mid-Continent cites Southwest Tank and Treater Manufacturing Co. v. Mid-Continent Casualty Co., 243 F. Supp. 2d 597 (E.D. Tex. 2003), a suit involving installation work on a large steel storage tank, in support of its argument that exclusion j(6) applies to all property damage to the condominium project that resulted from JHP's deficient work on the exterior structures.[2] However, as discussed in our recent case of Gore Design Completions, Ltd. v. Hartford Fire Insurance Co., 538 F.3d 365 (5th Cir. 2008), the Southwest Tank court "focused on the insured's work on the entire tank that was damaged, rather than on a particular part." Id. at 371 n.8. Southwest Tank, therefore, does not assist our analysis of a case where the defective work was performed on a discrete part of an overall project.

Gore involved the defective installation of an in-flight entertainment/cabin management system on a commercial aircraft. A subcontractor allegedly miswired a component, resulting in substantial physical damage to the aircraft's electrical systems and to a vast array of electrical equipment installed on the aircraft. Id. at 367–68. This court rejected the insurer's argument that exclusion j(6) applied to the entire aircraft, not just the in-flight entertainment/cabin management system or the electrical system, finding that "[the insurer's] reading of the exclusion reads out the words 'that particular part.'" Id. at 371 (citing Cruse, 938 F.2d 601 (construing a related provision to

---

[2] The insurance policies in both Gore and Southwest Tank were based on the same standard form used in this case and contained the same j(6) exclusion.

exclude damages to the defective foundation work performed by the insured but not damages to the entire house caused by that defective work)). We stated that "[i]f work on any part of a property would leave an insured exposed for damages to the entire property, the exclusion should state: 'Property damage to property that must be restored, repaired or replaced because your work was incorrectly performed on any part of it.'" Id.

Gore makes clear that the "[t]hat particular part" language of exclusion j(6) limits the scope of the exclusion to damage to parts of the property that were actually worked on by the insured, but Gore did not address the issue presented in this case: whether the exclusion bars recovery for damage to any part of a property worked on by a contractor that is caused by the contractor's defective work, including damage to parts of the property that were the subject of only nondefective work, or whether the exclusion only applies to property damage to parts of the property that were themselves the subject of the defective work. In Gore, there was no damage to portions of the plane that were the subject of only nondefective work by an insured; the damage occurred only to the portion of the plane that was itself the subject of the defective work, or other portions of the plane that were not the subject of any work by the general contractor or any subcontractors.

The plain meaning of the exclusion—property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it"—is that property damage only to parts of the property that were themselves the subjects of the defective work is excluded. This becomes clear when the exclusion is broken down into its component requirements: the "particular part" referred to is the part of the property that (1) must be restored, repaired or replaced (2) because the insured's work was incorrectly performed on it. The second requirement makes clear that the "particular part" of the property must have been the subject of incorrectly

performed work. The narrowing "that particular part" language is used to distinguish the damaged property that was itself the subject of the defective work from other damaged property that was either the subject of nondefective work by the insured or that was not worked on by the insured at all.

Even if the exclusion was susceptible to more than one reasonable construction, Texas law would still require that the policy be construed in favor of coverage. See Barnett, 723 S.W.2d at 666 (stating that a court "must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not itself unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties intent"). We find that exclusion j(6) bars coverage only for property damage to parts of a property that were themselves the subject of defective work by the insured; the exclusion does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property.

We are aware that there are some authorities that may at first glance appear to support a different interpretation. Several Texas courts of appeals have held that exclusions that bear some resemblance to exclusion j(6), and that appear to be predecessor versions of that exclusion contained in earlier versions of the standard form commercial general liability insurance policy, bar recovery for damage to any part of a property worked on by an insured that is caused by the insured's defective work, including damage to parts of the property that were the subject of only nondefective work. For example, in T.C. Bateson Construction Co. v. Lumbermens Mutual Casualty Co., 784 S.W.2d 692, 694–95 (Tex. App. 1989), the court found that an exclusion for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection

11

therewith," barred coverage for the cost of repairing or replacing non-defective as well as defective components of the insured's work. However, the exclusion at issue in T.C. Bateson—and in the other Texas cases that reach a similar result—was much broader in scope than the exclusion at issue in this case. The exclusion at issue in T.C. Bateson did not include any restrictive "that particular part" language, and instead broadly barred coverage for damage to the insured's work "arising out of the work or any portion thereof," which could reasonably be interpreted as excluding damage to any property worked on by an insured. See also Eulich v. Home Indemnity Co., 503 S.W.2d 846, 849–50 (Tex. App. 1973) (finding that same exclusion at issue in T.C. Bateson barred coverage for damage to entire building when building collapsed after completion because contractor installed a steel member whose strength was less than that required by the contract); cf. Travelers Ins. Co. v. Volentine, 578 S.W.2d 501, 504 (Tex. App. 1979) (finding that damage to other parts of engine resulting from defective valve job was not excluded under the exclusion at issue in T.C. Bateson because the insured worked only on the valve, not the entire engine, and intimating that damage to other parts of engine would have been excluded if insured had performed work on entire engine). Moreover, other Texas Courts of Appeals have interpreted similar exclusions as barring coverage for only property damage that was itself the subject of defective work, not damage to other work of the insured which was not defective. See Dorchester Dev. Corp. v. Safeco Ins. Co., 737 S.W.2d 380, 382 (Tex. App. 1987) ("[I]f defective work is performed by or on behalf of the insured, and such defective work causes damage to other work of the insured which was not defective, then there would be coverage for repair, replacement or restoration of the work which was not defective."), abrogated on other grounds by Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co., 267 S.W.3d 20 (Tex. 2008); Mid-United Contractors, Inc. v. Providence Lloyds Ins. Co., 754 S.W.2d 824, 828 (Tex. App. 1988) ("As pointed out in Dorchester, if the defective

12

work performed by or on behalf of the insured caused damage to other work of the insured which was not defective, there would have been coverage for repair, replacement or restoration of the work which was not defective.").

Another authority that may at first glance appear to support a different interpretation is the South Carolina Supreme Court's discussion of exclusion j(6) in a case that presented the same question raised by the instant case. In Century Indemnity Co. v. Golden Hills Builders, Inc., 561 S.E.2d 355 (S.C. 2002), the alleged defective construction of a new home's synthetic stucco exterior resulted in moisture damage to the substrate and framing members of the home. Id. at 356. The parties disputed whether the pronoun "it" and its antecedent ("[t]hat particular part of any property that must be restored, repaired or replaced") referred to the entirety of the home or only to that part of the work that was allegedly defectively constructed, i.e., the home's synthetic stucco exterior. Id. at 358–59. The court found that coverage of the water damage was excluded under the j(6) exclusion. Id. at 359. In reaching this conclusion, the court relied on the purpose of commercial general liability insurance, which is not to insure business risks, i.e., risks that are the normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage, including the risk that an insured's work will itself be defective, as opposed to the consequential risks that stem from the insured's work. Id. (citations omitted). We do not find this reasoning persuasive. The South Carolina Supreme Court based its decision on South Carolina case law, not Texas case law. Specifically, such reasoning is not set against the backdrop of specific language from the Texas Supreme Court rejecting a view of the general purpose of a commercial general liability policy as controlling the question of coverage. Under Texas law, whether there is coverage in a particular case depends on the language contained in the policy at issue; the mere fact that a policy is designated as a "commercial general liability"

insurance policy is not grounds for overlooking the actual language of that policy. See Barnett, 723 S.W.2d at 666. The Texas Supreme Court has warned that such "preconceived notion[s] . . . must yield to the policy's actual language," and that "coverage for [business risks] depends, as it always has, on the policy's language, and thus is subject to change when the terms of the policy change." Lamar Homes, 242 S.W.3d at 13–14.

In this case, there was no allegation that JHP performed defective work on the interior portions of the condominiums that were damaged by the water intrusion, including interior drywall, stud framing, electrical wiring, and wood flooring. The damage to the interior portions of the condominiums were the result of JHP's failure to properly water-seal the exterior finishes and retaining walls. The exterior finishes and retaining walls were distinct component parts that were each the subject of separate construction processes and are severable from the interior drywall, stud framing, electrical wiring, and wood flooring. The exterior finishes and retaining walls are "[t]hat particular part of any property that must be restored, repaired or replaced because [JHP's work] was incorrectly performed on it." Exclusion j(6) does not exclude coverage for the water damage to the interior portions of the condominiums.[3]

## V. Whether Mid-Continent is Bound by the Default Judgment in the Underlying Suit

Mid-Continent argues that it is not bound by the default judgment in the underlying suit because that suit was not a fully adversarial proceeding.[4] Mid-Continent relies on State Farm Fire and Casualty Co. v. Gandy, 925 S.W.2d 696

---

[3] If insurers believe that this interpretation expands coverage beyond that which commercial general liability insurance policies are supposed to provide, the j(6) exclusion can of course be rewritten to make clear that it excludes this sort of property damage from coverage.

[4] Mid-Continent also argues that it is not bound by the default judgment because there was no duty to defend or indemnify JHP in the first place under exclusions j(5) and j(6). As discussed above, those exclusions do not apply in this case.

(Tex. 1996), in which the court invalidated an insured's assignment of his claims against his insurer. The Gandy court held that "a defendant's assignment of his claims against his insurer to a plaintiff is invalid if (1) it is made prior to an adjudication of plaintiff's claim against defendant in a fully adversarial trial, (2) defendant's insurer has tendered a defense, and (3) either (a) defendant's insurer has accepted coverage, or (b) defendant's insurer has made a good faith effort to adjudicate coverage issues prior to the adjudication of plaintiff's claim." Id. at 714. The Gandy court did "not address whether an assignment is also invalid if one or more of these elements is lacking," but stated that "[i]n no event, however, is a judgment for plaintiff against defendant, rendered without a fully adversarial trial, binding on defendant's insurer or admissible as evidence of damages in an action against defendant's insurer by plaintiff as defendant's assignee." Id.; see also Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 821 (Tex. 1997) (stating that whether insurer was bound by the amount of the underlying judgment against an insured, who had assigned any claims he might have had against insurer to the plaintiff in exchange for the plaintiff's promise not to execute against any of the insured's assets except any coverage afforded by the insurance policy, was "controlled by" Gandy).

Prior to Gandy, the Texas Supreme Court held in Employers Casualty Co. v. Block, 744 S.W.2d 940 (Tex. 1988), that an insurer who refuses to defend an insured when it has a duty to do so is bound by the amount of the judgment against the insured. Id. at 943. Faced with "sweetheart deals" that were the product of collusion between the insured and the injured claimant, the Texas Supreme Court issued Gandy, thus modifying Block in certain cases in which there has been an assignment of rights from the insured to the injured claimant and a judgment for the claimant against the insured rendered without a fully adversarial trial. Gandy, 925 S.W.2d at 713–14. However, the Texas Supreme Court recently clarified in Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.,

256 S.W.3d 660 (Tex. 2008), that "Gandy's holding was explicit and narrow, applying only to a specific set of assignments with special attributes" indicating a likelihood that the assignments would prolong the dispute and distort trial litigation motives, and that "[b]y its own terms, Gandy's invalidation applies only to cases that present its five unique elements." Id. at 673. In Evanston, there had been no assignment of the insured's claim, and the court held that Gandy did not disrupt the application of Block to a case where such a "key factual predicate" of Gandy was missing. Id.

As in Evanston, Gandy is not implicated because this suit is not an action against defendant's insurer by plaintiff as defendant's assignee; JHP did not assign any claims it may have had against Mid-Continent to TRC. Because Mid-Continent breached its duty to defend, it is bound by the amount of the judgment in the underlying suit.

VI.  Conclusion

Under our view of Texas law, exclusion j(5) and exclusion j(6) do not operate to exclude coverage for the damages asserted. A plain reading of the language of exclusion j(5) shows that it applies only to property damage caused during active physical construction activities, and that it does not apply to property damage that occurs during a prolonged, open-ended, and complete suspension of construction activities. A plain reading of the language of exclusion j(6) shows that it bars coverage only for property damage to parts of a property that were themselves the subjects of defective work, and not for damage to parts of a property that were the subjects of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property. The undisputed summary judgment evidence demonstrates that the factual allegations contained in the petition in the underlying suit and the facts actually established in that suit concerning water damage to the interior portions of the condominiums do not fall within the ambit

of exclusion j(5) or exclusion j(6).[5]  As a result, Mid-Continent had a duty to defend and indemnify JHP with respect to that damage.  Further, Mid-Continent is bound by the default judgment in the underlying suit to the extent found by the district court.  Accordingly, the judgment of the district court is AFFIRMED.

---

[5] Mid-Continent's motion to certify questions to the Texas Supreme Court is denied as moot.