# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 20, 2024

Lyle W. Cayce
Clerk

———————

No. 23-40435

———————

TIG Insurance Company, *as successor by merger to* American Safety Indemnity Company,

*Plaintiff—Appellee*,

*versus*

Woodsboro Farmers Cooperative,

*Defendant—Appellant*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:18-CV-191

———————————————————

Before Dennis, Southwick, and Ho, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*.

In this insurance-coverage action, we must decide what constitutes "property damage" that would invoke an insurer's obligation to indemnify under a common Commercial General Liability insurance policy. The district court determined there was no property damage under the policy, and the insurer therefore had no duty to indemnify the insured for an adverse state arbitration award. We find there to be fact questions that invalidate the grant of summary judgment.

We REVERSE and REMAND.

No. 23-40435

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2013, Woodsboro Farmers Cooperative contracted with E.F. Erwin, Inc. to construct two Brock 105' diameter grain silos in Woodsboro, Texas. Erwin hired subcontractor AJ Constructors, Inc. ("AJC") to construct the silos, and Erwin was responsible for supervising the work. Though the contracts had no deadline, Erwin told Woodsboro that the silos, or at least their bins, would be ready by June or July — in time for the 2013 harvest.

Brock silos start as kits shipped from the manufacturer and are then assembled according to the manufacturer's manuals and specifications. The kits include prefabricated metal walls, roof sheets, and other items necessary for construction. The silos are constructed section by section, starting with the roof. The prefabricated, corrugated metal walls are bolted together to form a ring, and the roof is raised and secured to the first ring with purlins, joists, and struts. The first ring is then jacked up and the next ring is bolted to the first. The process continues until the silo is fully assembled. In short, constructing a silo is a matter of assembly. It requires putting the pieces together pursuant to the manufacturer's instructions.[1]

AJC began erecting the silos in May 2013 and completed its work in June or early July. At various stages, Erwin inspected the quality and progress of AJC's work. Although Erwin observed some cosmetic problems in the roofing, he determined the silos were structurally sound and not defective. AJC left the job site after completing the assembly. Erwin completed the rest of the project on November 1, 2013, and signed an affidavit of completion as required by the contract with Woodsboro.

---

[1] There are other aspects of the job, *e.g.*, laying a concrete foundation and post-assembly millwright and electrical work. This case, however, concerns only the assembly.

According to Woodsboro, at this time Erwin represented that the silos were ready to be used as intended.

Before Woodsboro tendered its final payment, it noticed several defects that caused the silos to leak. To address the leaks, Woodsboro and Erwin signed an addendum to their original contract in late November 26, 2013. Woodsboro agreed to make the final payment to Erwin as consideration for repairing a list of deficiencies for each silo. Sometime between November 2013 and May 2014, Erwin attempted to repair the defects but was unable to make them watertight.

When it became clear Erwin would not be able to fully repair the silos, Woodsboro contacted Buck Pitcock of Pitcock Supply, Inc., to inspect them. Pitcock observed numerous faults with the silos' assembly, including missing or loose bolts; gaps in the tank walls and ceiling; incorrectly installed tank stiffeners; improper sealing; and unsecured roofing. Pitcock concluded that the failure to secure the roofs properly allowed them to "flex and move" in the wind and weather, causing the silos' metal parts to fatigue and bend. As the overall condition of the silos deteriorated, damage from wind and weather accelerated. This could have led the entire structures to fail. Pitcock attributed the damage to AJC's "poor workmanship." Because the silos are constructed by jacking up each section, starting with the roof, they had to be deconstructed in their entirety to fix the damage and then reconstructed. It is undisputed that Woodsboro had to take these steps to fix the problem.

In March 2015, Woodsboro hired Pitcock Supply to repair the silos. New Brock kits were purchased because certain parts were so damaged they could not be re-used. When Pitcock Supply finished its work in June, Woodsboro's total cost was $805,642.74.

In August 2014, Woodsboro sued Erwin in Texas state court for breach of contract. In 2017, the case was sent to an arbitration panel. The

panel found AJC had negligently constructed the silos; the silos were defective and did not conform to the construction contract and subcontract; and Erwin was unwilling or unable to repair them. The panel awarded Woodsboro a total of $988,073.25 in damages.[2] In October 2018, Woodsboro moved for the Texas state court to confirm the award, and then in November asked the arbitration panel to amend the award to account for certain costs. The motion to confirm was pending for nearly four years before the court issued a final judgment confirming the award in September 2022.

In December 2018, TIG Insurance Company, successor by merger to American Safety Indemnity Company ("TIG"), sued Woodsboro and Erwin in the United States District Court for the Southern District of Texas. TIG invoked diversity jurisdiction and sought declaratory relief on its duty to defend and indemnify as Erwin's insurer. Woodsboro and Erwin then moved to dismiss for lack of subject matter jurisdiction, arguing the matter was not ripe for adjudication because the Texas state court had not yet issued a final judgment, leaving TIG without standing. The district court denied the motion because, even if the issue of TIG's duty to indemnify was not ripe, the issue of its duty to defend was ripe and was sufficient to provide standing.

In March 2022, the district court ruled on the parties' cross-motions for summary judgment. The court granted TIG's motion as to its duty to defend, finding the underlying pleadings failed to show that Erwin's breaches resulted in "property damage" required for coverage under the policy and, even if such damage existed, several exclusions would apply. *See VRV Dev. L.P. v. Mid-Continent Cas. Co.*, 630 F.3d 451, 456–57 (5th Cir. 2011). The court did not rule on the issue of indemnity because final judgment in the

---

[2] Woodsboro's net award, including prejudgment interest and attorneys' fees, was $1,300,241.39. Erwin was awarded a total recovery of $1,079,963.81 against AJC. Arbitration costs were divided between Erwin and AJC.

underlying case had not yet issued. Thereafter, Woodsboro and Erwin filed another motion to dismiss for lack of jurisdiction, but by the time the district court ruled on the motion in October 2022, the state court had entered a final judgment and the issue of indemnity was ripe.

In June 2023, the district court granted the remainder of TIG's motion for summary judgment. The court concluded there was no "physical injury to tangible property" because of Erwin's breach apart from defective construction, nor was there any "loss of use" of the silos because the arbitration panel found that Woodsboro had lost profits on account of Erwin's late delivery of the project. The district court further determined that, even if its conclusions regarding property damage were incorrect, three policy exclusions would apply, though application of one of the exclusions would be negated by an exception. Woodsboro timely appealed.

## DISCUSSION

We review a grant of summary judgment *de novo*, "applying the same standard as the district court." *Lamb v. Ashford Place Apartments LLC*, 914 F.3d 940, 943 (5th Cir. 2019) (citation omitted). Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When parties file cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *A.A. v. Northside Indep. Sch. Dist.*, 951 F.3d 678, 684 (5th Cir. 2020) (citation omitted). The grant or denial of a motion to dismiss for lack of jurisdiction is also reviewed *de novo*, and "the jurisdictional issue of ripeness is a legal question for which review is *de novo*," as well. *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (italics added). "[W]e must apply Texas law" to this diversity action and, if no authority from the Supreme Court of

Texas exists, we make "an *Erie* guess as to how [that court] would decide the question before us." *Gilbane Bldg. Co. v. Admiral Ins. Co.*, 664 F.3d 589, 593 (5th Cir. 2011) (citation omitted).

TIG argues it is entitled to summary judgment and therefore we should affirm the district court. Woodsboro argues it is entitled to summary judgment and therefore we should render judgment in its favor, or at least remand to the district court for additional factfinding and a trial, if necessary. We will start, though, with Woodsboro's alternative argument that the district court lacked subject matter jurisdiction, because our decision on that issue determines whether we can resolve the others. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

## I.    *Subject matter jurisdiction*

Woodsboro has two jurisdictional arguments. First, TIG allegedly lacked standing to pursue a declaratory action on its duty to defend because AJC's insurer, Landmark American Insurance Company, covered Erwin's defense costs in the underlying proceeding, and Erwin waived in writing any right to seek defense costs from TIG. Second, the issue of indemnity allegedly was not ripe for adjudication because, under Texas law, a duty to indemnify does not accrue until there is a final judgment.

As a general matter, federal courts may issue declaratory judgments only where "there exists an actual case or controversy." *Columbia Cas. Co. v. Ga. & Fla. RailNet, Inc.*, 542 F.3d 106, 110 (5th Cir. 2008). "An actual case or controversy exists before the resolution of an insured's underlying suit concerning the insurer's *duty to defend.*" *Id.* (emphasis in original). Under Texas law, an insurer's duties to defend and indemnify "are distinct, and they are to be decided separately." *Gilbane*, 664 F.3d at 594. The duty to defend is governed by the "eight-corners rule," *i.e.*, determined "solely by the facts alleged in the petition and the terms of the policy." *Colony Ins. Co.*

*v. Peachtree Constr., Ltd.*, 647 F.3d 248, 253 (5th Cir. 2011). The duty may arise if the alleged facts "*potentially* assert a claim for coverage under the insurance policy." *Id.* (emphasis in original). The duty to indemnify, on the other hand, is determined "by the actual facts establishing liability in the underlying suit," and therefore "generally cannot be ascertained until the completion of litigation." *Id.*

Here, the district court had jurisdiction to decide TIG's duty to defend even though the underlying proceedings were not final. An actual case or controversy exists in declaratory actions on an insurer's liability for an underlying state-court action while the action is still pending. *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273–74 (1941). Because the duty to defend is constrained by the eight-corners rule, "an insurer's duty to defend can be determined at the moment the petition is filed." *Colony*, 647 F.3d at 253. Thus, once Woodsboro filed a petition for breach of contract, there existed a *potential* claim for coverage sufficient to constitute a case or controversy and confer standing on TIG as Erwin's insurer. *Id.* Further, because the duty to defend is "decided separately" from the duty to indemnify, federal courts have jurisdiction to decide the former even if the latter cannot be addressed. *Gilbane*, 664 F.3d at 594.

The district court also did not err in refusing to consider Erwin's affidavit waiving any claims for defense costs. Under Texas law, the eight-corners rule "strictly circumscribe[s]" the court's analysis of a duty to defend. *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 744 (Tex. 2009). The Supreme Court of Texas recently recognized a collusion exception to this rule and ratified and refined the gap-in-the-pleadings exception initially recognized by this court. *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 199, 200–03 (Tex. 2022). Woodsboro makes no assertion that either exception applies.

Finally, the district court did not err in "defer[ring] resolution of indemnity issues until the liability litigation [was] resolved" and a final judgment was entered. *Hartford Cas. Ins. Co. v. DP Eng'g, LLC*, 827 F.3d 423, 431 (5th Cir. 2016) (quoting *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997)). Accordingly, we have jurisdiction under 28 U.S.C. § 1291,[3] and we may proceed.

## II.    *TIG's motion for summary judgment*

Woodsboro does not appeal the district court's ruling that TIG had no duty to defend, so we do not review that determination. Regardless, TIG may have a duty to indemnify. That duty depends on the "facts actually established in the underlying suit" and not on the allegations in the complaint. *D.R. Horton*, 300 S.W.3d at 744 (citation omitted). Here, Woodsboro challenges the district court's determination that the damage to the silos was not "property damage" covered by Erwin's insurance policy, and even if it were, several exclusions would apply.

### a.    *Property damage*

Erwin holds a standard Commercial General Liability ("CGL") insurance policy. The policy covers "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." As relevant here, the policy insures "property damage" only if it "is caused by an 'occurrence' that takes place in the 'coverage territory.'" The district court determined the claimed damage was caused by a proper "occurrence." TIG does not challenge this determination on appeal, and we therefore accept it.

---

[3] No ruling on TIG's bill of costs has been made. We may treat the order granting summary judgment as a final order even when a motion for costs is pending. *Samaad v. City of Dallas*, 922 F.2d 216, 217–19 (5th Cir. 1991).

"Property damage" is defined in Erwin's policy in two ways:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Like most CGL policies, Erwin's does not define "physical injury," so its meaning in Texas has been supplied by the state's Supreme Court. *See U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 24–28 (Tex. 2015). Under Texas law, "physical injury" to tangible property "requires tangible, manifest harm and does not result merely upon the installation of a defective component in a product or system." *Id.* at 27. Thus, "faulty workmanship that merely diminishes the value of the [property] without causing physical injury or loss of use does not involve 'property damage.'" *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 10 (Tex. 2007). On the meaning of "property damage" and "physical injury," the district court and the parties agree. The parties dispute, however, whether the problems here were defective assembly, or whether Erwin caused tangible, manifest harm to the silos.

The district court determined Erwin's role was "more akin to 'defective installation' requiring repair than defective work which caused physical damage to *other* property." The district court considered Woodsboro's affidavits and evidence as to the extent of the damage and concluded that "the entirety of the silo was defectively constructed and required repairs." Contrary to this conclusion, Woodsboro insists its evidence demonstrates the damage was from wind and weather that caused the silos' metal parts to degrade, bend, and fatigue. Although AJC's faulty workmanship *exposed* the silos' metal parts to harm, Woodsboro incurred

repair and reconstruction costs because the *wind and weather* damaged the parts to such an extent they became unusable. TIG questions whether any evidence regarding the silos' deterioration was before the arbitration panel,[4] and, even if it were, TIG states it was not the reason for the damage award.

We start with the "facts actually established in the underlying suit," which is the arbitration in this case. *D.R. Horton*, 300 S.W.3d at 744 (citation omitted). The arbitration panel found the silos "were defectively constructed and could not be placed into service either as constructed or as repaired by Erwin." Erwin had "sole control of the means and methods of construction," and the "erection work performed by AJ[C] was negligently performed." This "defective work resulted in damages to Woodsboro." Based on testimony and evidence, the panel found the silo bins "as originally constructed by AJ[C], were defective." It also found that "Erwin was unwilling or unable to repair [the bins] and [they] required deconstruction, repair, and proper reerection" by Pitcock Supply.

Although the district court's interpretation might be reasonable on the face of the arbitration decision, it failed to make all inferences in Woodsboro's favor as the nonmoving party. *See A.A.*, 951 F.3d at 684. True, the panel found that the silo bins were defective "as originally constructed," but that does not mean it found Woodsboro's damages were exclusive of physical injury to the silos' parts caused by the wind and weather. The panel also found that the silos "required deconstruction, *repair*, and proper reerection." Pitcock testified in the arbitration proceedings that the defects

---

[4] The necessity for evidence to have been presented to the arbitration panel before it could be considered by the district court for indemnity purposes was not resolved. TIG moved to strike Woodsboro's summary judgment evidence because it "was not in evidence at the arbitration proceeding." The district court mentioned the motion to strike when it decided TIG's duty to defend, but the motion was denied "at this time." The court did not later rule on the issue.

in the silo roofs' construction left them unsecure and "free to move around" and "the roof superstructure was moving and shifting in the wind and weather." This caused the roofs' metal parts to "fatigue, and then bend," damaging the roof to such an extent that an entirely new Brock roof kit had to be purchased. Pitcock observed similar degradation to the rest of the structure. Pitcock estimated "60% of the new parts that had to be purchased were to replace parts that had been damaged from the working of [the] silo[s] in [the] wind," while the other 40% were needed to bring the silos up to code. Pitcock's invoices to deconstruct, repair, and reconstruct the silos amounted to $805,642.74, the exact amount the arbitration panel awarded Woodsboro for its repair costs.

Viewing the facts in this light, this case is distinguishable from precedent involving repairs to defective work with no damages resulting from the work. In the principal authority on which the district court relied, U.S. Metals sold ExxonMobil Corp. faulty flanges that were installed in nonroad diesel units;[5] the flanges had to be replaced because they did not meet industry standards and caused the units to leak. *U.S. Metals*, 490 S.W.3d at 21–22. The Supreme Court of Texas held that installation of the faulty flanges did not constitute "physical injury"; the flanges diminished the use or function of the diesel units but did not physically injure them. *Id.* at 24, 28.

The Supreme Court of Texas quoted with approval a case from the Illinois Supreme Court that described what was needed to show physical injury apart from "intangible damage, such as diminution in value": "a harmful change in appearance, shape, composition, or some other physical

---

[5] Nonroad engines are combustion engines that are not used in motor vehicles or vehicles used solely for competition, such as engines used in equipment. 42 U.S.C. § 7550(10); 40 C.F.R. § 1068.30.

dimension to the claimants' property." *Id.* at 25 (quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 496–97 (Ill. 2001)). Because the faulty flanges were replaced before any leaking could damage the diesel units, their mere installation did not result in physical injury to Exxon's property. *Id.*

The district court likened AJC's defective construction of the silos to the installation of U.S. Metal's faulty flanges because, in the court's view, both had "*future potential* to cause harm or injury to other property but was replaced before it could actually do so." Here, though, there was evidence that the damage to the silos was not just potential but had actually occurred due to the force of the wind and other weather, causing the silos' metal parts to bend, fatigue, and deteriorate to the point where the silos were not structurally sound. This constitutes "a harmful change in appearance, shape, composition, or some other physical dimension to the claimants' property." *Id.*

We conclude this case is more analogous to *Lamar Homes*, in which the Supreme Court of Texas held that the faulty construction of a home's foundation caused the home's sheet rock and stone veneer to crack, constituting "physical injury" to "tangible property." 242 S.W.3d at 10. Further, the district court and TIG appear to take issue with the fact that the damaged property was the silos themselves, not "other" property. *Lamar Homes* suggests this is irrelevant to whether there is "property damage," but is instead an issue addressed by policy exclusions. *Id.* We will discuss that, but we have one more issue to address first.

At oral argument, TIG's counsel asserted there was no evidence or suggestion that damage to the silos from wind and weather occurred during Erwin's effective policy period of February 2013 to February 2014. Counsel further argued that whatever wear and fatigue was found when

reconstructing the silos was irrelevant to liability because reconstruction occurred years after the policy expired.

The record reveals at least some evidence of wind and weather damage during the policy period. In a deposition taken during the underlying arbitration proceedings, Erwin testified there was a storm in late September or early October 2013 that had "some wind," and he guessed "the wind moved the bins around" and caused the silos to "start[] leaking all over again." Emails during the policy period corroborate the ongoing problem of leaks following storms in October 2013, and the problem persisted past November 2013. Thus, although the degraded state of the metal parts was not observed until Pitcock's May 2014 inspection, there is evidence that damage to the silos occurred, at least partially, during the policy period.

As a matter of law, it is irrelevant that the damage to the metal parts was first observed after the policy period expired. According to the Supreme Court of Texas, when analyzing "'property damage' which occur[red] during the policy period," as we do here, "[o]ccurred means when *damage* occurred, not when *discovery* occurred." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 30–31 (Tex. 2008) (emphasis in original). This is called the "actual injury" rule. *Id.* at 25. In that case, the court rejected the "manifestation rule" that supports TIG's argument. The manifestation rule permits coverage "only if the property damage became evident or discoverable during the policy term." *Id.* at 26–29. The court endorsed the "actual injury" rule instead because it is more faithful to the language of CGL policies, such as the one here. *Id.* at 29–30.

Satisfied that the evidence, when viewed in the light most favorable to Woodsboro, supports the determination that "property damage" occurred, we move on to consider the exclusions that might negate coverage.[6]

### b.     Exclusion j(5)

Section I(2)(j)(5) ("exclusion j(5)") of Erwin's CGL policy excludes from coverage "property damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." The use of the present tense in "performing operations" means the exclusion applies to property damage caused during "the active performance of work." *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009).

Although the district court determined there was no "property damage," it assumed *arguendo* that there was "loss of use" of non-injured property. It then concluded exclusion j(5) precludes coverage because the loss of use was "a direct result of negligence during the construction process, not by some force post-construction." It also concluded "the entirety of the project" was the "particular part" of property subject to Erwin's and AJC's defective work. On appeal, Woodsboro does not challenge the district court's "particular part" reasoning, but it does argue that the exclusion does

---

[6] We do not address the district court's conclusion that Woodsboro suffered no "property damage" via "loss of use" of property that is not physically injured. That is because Woodsboro abandoned any argument against it by failing to raise the issue on appeal. *Sindhi v. Raina*, 905 F.3d 327, 334 (5th Cir. 2018). Further, we do not address the exclusion found in Section I(2)(m) of Erwin's policy because it only excludes from coverage "property damage" to "impaired property" or "property that has not been physically injured." No party argues that this case involves "impaired property," and the district court seemingly agreed. Our determination that there is at least some evidence of physical injury, therefore, makes it unnecessary to address this exclusion.

not apply because the property damage did not occur until after "operations" were complete.

We agree there is evidence to support that view. AJC's operations in the project concluded in June or early July 2013. At that point, Erwin only noticed some cosmetic defects, but the silos otherwise appeared structurally sound. There is evidence suggesting that sometime between AJC's exit from the project and Pitcock's assessment in May 2014, wind and weather damaged the silos. Thus, damage from the wind and weather could have occurred after AJC's "active performance of work." *Id.*

Moreover, although Erwin is the insured and was responsible for overseeing the entirety of the project, it is uncontested that any damage was the result of AJC's negligent work. Thus, "those operations" from which the damage from wind and weather "arose" do not include Erwin's post-assembly millwright and electrical work. *See Gonzalez v. Mid-Continent Cas. Co.*, 969 F.3d 554, 561 (5th Cir. 2020) (segmenting the operations for which the insured was and was not hired). When viewed in the light most favorable to Woodsboro, the evidence suggests exclusion j(5) does not apply because the property damage occurred after AJC completed its operations.

c.    *Exclusion j(6) and its exceptions*

Section I(2)(j)(6) ("exclusion j(6)") excludes from coverage "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." This exclusion applies "only for property damage to parts of a property that were themselves the subject of defective work by the insured" and "does not bar coverage for damage to parts of a property that were the subject of only nondefective work by the insured and were damaged as a result of defective work by the insured on other parts of the property." *Mid-Continent*, 557 F.3d at 215.

Like with exclusion j(5), the district court determined the entirety of the project was Erwin's and AJC's defective work, and therefore exclusion j(6) applied because the entirety of the silos had to be "restored, repaired or replaced." Woodsboro argues this was error because AJC's defective work was limited to improper installation, tightening, and securing of the silos' bolts and roof vent covers. Woodsboro argues this case is similar to *Mid-Continent*, in which we held that exclusion j(6) did not apply where an insured failed to seal exterior finishes and the retaining walls of a condominium properly, leading to water damage to the "interior drywall, stud framing, electrical wiring, and wood flooring" of the condos. *Id.* at 217.

It is difficult to extend *Mid-Continent*'s rationale to this case. Brock silos are assembled from kits consisting of prefabricated metal walls, roofing sheets, and other items necessary for construction. AJC's job was to assemble these pieces, including bolting together the metal walls to form rings that are attached to the roof and jacked up section by section until the entire silo is assembled. It is true, as Woodsboro argues, that the damaged metal parts were not literally the subject of AJC's work because it did not manufacture or further process them; it put the pre-made pieces together. Nevertheless, AJC was hired to assemble the silos completely using the provided parts. Thus, this is not a case where faulty construction of one "distinct component part[]" of a project led to damage to other distinct parts, such as defective exterior finishes and retaining walls ultimately damaging "interior drywall, stud framing, electrical wiring, and wood flooring." *Id.*; *see also Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 371–72 (5th Cir. 2008).[7]

---

[7] If, for example, AJC's faulty assembly damaged other parts of the silos, such as the electrical work or foundation, this argument might fare better. The arbitration panel,

Regardless, even if exclusion j(6) applies, there is an exception that negates it. Under Erwin's CGL policy, exclusion j(6) does not apply to "'property damage' included in the 'products-completed operations hazard.'" "Products-completed operations hazard" includes, as relevant, all "'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except . . . [w]ork that has not yet been completed or abandoned." Moreover, "[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

The district court determined that this exception to exclusion j(6) applies because the damage to the silos did not occur on Erwin's rented or owned property, arose from its work away from its property, and occurred after the project was "completed" because the need for repair or replacement does not affect the project's completed status. This is consistent with the exception's plain text and, even if the policy's language were ambiguous, Texas law would require we construe the policy in favor of coverage. *Mid-Continent*, 557 F.3d at 212. Accordingly, the district court did not err in concluding the exception to exclusion j(6) applies, assuming that the exclusion itself applies.

## III.   *Woodsboro's cross-motion for summary judgment*

We conclude summary judgment for TIG should not have been granted. Woodsboro seeks more from us, though, and that is to hold that summary judgment for Woodsboro should have been granted, at least in part. In its cross-motion for summary judgment, Woodsboro allocated its costs between the costs allegedly covered and those that were not. Of the

---

however, denied Woodsboro's claims for damages to the foundation and a concrete ramp arising from AJC's and Erwin's work.

$805,642.74 arbitration award for deconstruction, repair, and reconstruction costs, Woodsboro asserted $786,868 is covered because it consists of "all labor and materials necessary for deconstructing, repairing and replacing damaged parts, and then reconstructing the bins."[8] Woodsboro correctly states that TIG does not provide other record evidence that would refute Woodsboro's factual contentions; TIG only refers to the language of the arbitration award and the district court's conclusions from it.

The problem for Woodsboro is the ambiguity of the arbitration panel's award and the lack of a record or transcript from the arbitration proceedings. As mentioned, the arbitration panel found that the silos were "defectively constructed" because AJC's erection work was "negligently performed." The discussion above explains inferences that could be made in Woodsboro's favor. Still, inferences could be made in TIG's favor, which is required when reviewing Woodsboro's summary judgment motion. *A.A.*, 951 F.3d at 684.

For example, Pitcock's affidavit consistently states that he testified in the underlying proceeding as to the facts asserted therein. Woodsboro also provided deposition transcripts of numerous witnesses, including Pitcock, from the underlying proceeding. In its decision, the arbitration panel said it relied on "testimony" and "evidence submitted" regarding the costs of repairing and replacing the silos, but it did not say whose testimony it credited and on what evidence it relied. Notably absent from the panel's decision is any mention of wind or weather damaging the metal parts of the silos. This supports an inference that the arbitration panel found Erwin liable

---

[8] The remaining $18,774.74 is not covered because it relates to repairs to parts of the project AJC never worked on; specifically, a "platform/catwalk" and the "grain elevator."

only for AJC's initial negligent construction and not for any property damage from the elements.

With respect to the $167,209 lost "profit for late delivery of [the] project" award, the panel was a little more specific as to what evidence it credited because there was "conflicting testimony regarding the losses." That said, the award was specific to Woodsboro's inability to "place the grain bins in service for the 2013 harvest season." The record suggests the harvest season covers the summer months, which is when Erwin initially represented the project would be complete and well before Erwin certified the project's completion in November. If this were the case, any "loss of use" from delayed delivery would not be a "resulting loss" from property damage attributable to AJC's faulty construction, or at least not exclusively. Of course, we do not resolve this factual dispute at this stage; we merely note its existence.

*     *     *

Genuine disputes of material facts exist, making the district court's grant of summary judgment improper. Absent additional evidence of what was before the arbitration panel, there may be a gap in the facts adduced in the underlying proceeding and those necessary to determine TIG's duty to indemnify. "The underlying case often does not resolve all the factual issues necessary to determine coverage because issues relevant to the question of coverage can be irrelevant to the question of the insured's liability." *National Union Fire Ins. Co. of Pittsburgh v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008).

Texas law allows the introduction of evidence in coverage litigation where necessary facts are not established in the underlying liability litigation. *D.R. Horton*, 300 S.W.3d at 745. For example, the arbitration panel was not required to find that AJC's negligent construction caused physical injury to

No. 23-40435

the silos; it only had to find that AJC was negligent in its performance and that Erwin and AJC were in breach of their respective contracts. As Woodsboro notes, "physical injury can be inferred from [the panel's] findings and the evidence," but that is inappropriate at this stage. Accordingly, additional factual development of the record is needed, which may or may not include a trial.

REVERSED and REMANDED.